COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-05-392-CV

 

 

IN THE INTEREST OF M.R.J.M., A CHILD                                                 

 

 

                                              ------------

 

           FROM COUNTY
COURT AT LAW NO. 1 OF PARKER COUNTY

 

                                              ------------

 

                                OPINION ON REHEARING

 

                                              ------------

                                           I.
Introduction








The trial court terminated the parental rights of
Appellant Michael M. to his child M.R.J.M. 
The trial court denied Michael=s motion
for new trial after a hearing under family code section 263.405 and signed an
order finding that any appeals from the termination would be frivolous.  See Tex. Fam. Code Ann. ' 263.405(d)
(Vernon 2008).  Michael appealed from
that finding and from the trial court=s
judgment terminating his parental rights. 
In an earlier order, we held that the trial court abused its discretion
when it found Michael=s appeal frivolous, and we
ultimately ordered a complete record of the proceedings below.  After reviewing the record and all briefs
filed, we affirm the judgment terminating his parental rights.

                           II.
Factual and Procedural Background

M.R.J.M. was born in September 1999; she was six
years old at the October 2005 trial. 
M.R.J.M.=s mother (AMother@) was
sixteen when she met and moved in with Michael, then age thirty-three.  Mother left Michael while M.R.J.M. was still
a baby, but Michael always knew where to find them.

Mother abused drugs:  marijuana and cocaine when she was with
Michael; mostly methamphetamine and marijuana by the time M.R.J.M. and Mother=s other
children were removed by Child Protective Services (ACPS@) in
2004.[1]  The father of Mother=s other
three children executed a voluntary affidavit of relinquishment of his parental
rights before trial.  Mother executed a
voluntary affidavit of relinquishment of her parental rights to all four
children before closing arguments.








The jury charge indicated that to terminate
Michael=s
parental rights to M.R.J.M., the jury had to find by clear and convincing
evidence that Aat least one of the following@ had
occurred: that Michael knowingly placed or knowingly allowed M.R.J.M. to remain
in conditions or surroundings that endangered her physical or emotional
well-being; that he engaged in conduct or knowingly placed M.R.J.M. with
persons who engaged in conduct that endangered her physical or emotional well-being;
or that he constructively abandoned M.R.J.M. 
See Tex. Fam. Code Ann. ' 161.001(1)(D),
(E), (N) (Vernon 2008).  The jury charge
also required that, to terminate Michael=s
parental rights, the jury had to find by clear and convincing evidence that
termination of the parent-child relationship would be in M.R.J.M.=s best
interest, and the jury charge listed factors that the jury could consider.  See id. ' 161.001(2).

The application question stated, AShould
the parent-child relationship between [Michael] and the child, [M.R.J.M.] be
terminated?@ 
The jury responded, AYes.@  The trial court ordered termination of
Michael=s
parental rights in accordance with the jury=s
verdict.








Michael filed a motion for new trial, setting out
his statement of points for appeal.[2]  The trial court denied Michael=s motion
for new trial, found him indigent, and found his appeal frivolous.  Michael appealed.








In our initial review of Michael=s
appeal, we ordered a record Aof all
of the evidence admitted [at trial].@  See In re M.R.J.M. (M.R.J.M. I),
193 S.W.3d 670, 674 (Tex. App.CFort
Worth 2006, order) (en banc).  On March
28, 2008, we issued an opinion affirming the trial court=s
frivolousness finding, and Michael filed a motion for rehearing.  Subsequently, we withdrew the March 28
opinion. We issued an order on September 9, 2008, granting Michael=s motion
for rehearing and ordering Michael to file a brief on the merits regarding
those issues not already addressed in his statement of points because we agreed
that Michael=s issue challenging the
constitutionality of section 263.405(i) was not frivolous.[3]  In our order, we concluded that Michael=s appeal
presented a substantial question for appellate review, and we sustained Michael=s first
rehearing issue, holding that the trial court abused its discretion by finding
Michael=s appeal
frivolous and restricting the appellate record to the section 263.405(d)
hearing.  We ordered that Michael was entitled
to appeal from the trial court=s
termination order and that he was entitled to a complete record of the
underlying proceedings.

                                           III.
Discussion

A. Michael=s
Complaints

Michael=s
original brief contains the following four issues:

[Issue 1]:  Does section 263.405(g) of the Texas Family
Code unconstitutionally interfere with this Court=s jurisdiction under
section 6(a) of article V of the Texas Constitution?

 

[Issue 2]:  To the extent section 263.405 requires a
showing that an appeal would not be frivolous before the appeal may proceed,
does it violate the Due Process Clause of the United States Constitution?

 








[Issue 3]:  The trial court erred in finding the appeal
frivolous [complaining that section 263.405(i) violated the separation of
powers doctrine, the broad-form jury charge submission was improper, the trial
court made an improper comment during voir dire, and the evidence was not
factually sufficient to support grounds (D), (E), and (N) and the best interest
finding].

 

[Issue 4]: 
The trial court erred in instructing the court reporter not to prepare a
record of the trial and by ordering the court reporter and the clerk to prepare
records of the section 263.405(d) hearing only.

Michael=s brief
in support of his motion for rehearing contains the following five issues:

[Rehearing Issue 1]:  The trial court erred in finding the appeal
frivolous and, in turn, restricting the appellate record to the section
263.405(d) hearing, held on November 22, 2005.

[Rehearing Issue 2]:  The evidence is factually insufficient to
show [Michael] knowingly placed or knowingly allowed [M.R.J.M.] to remain in
conditions or surroundings that endangered her emotional or physical
well-being.

 

[Rehearing Issue 3]:  The evidence is factually insufficient to
show [Michael] engaged in conduct or knowingly placed M.R.J.M. with persons who
engaged in conduct that endangered her physical or emotional well-being.

 

[Rehearing Issue 4]:  The evidence is factually insufficient to
show [Michael] constructively abandoned the child who had been in the permanent
or temporary managing conservatorship of the Department or an authorized agency
for not less than six months and (a) the Department or authorized agency had
made reasonable efforts to return the child to the father, (b) the father had
not regularly visited or maintained significant contact with the child, and (c)
the father had demonstrated an inability to provide the child with a safe
environment.

 

[Rehearing Issue 5]:  The trial court erroneously submitted the
charge in broad form.








Michael stated that after reviewing the October 1, 2008 supplemental
reporter=s
record, he had no further issues that he wanted to raise. 

B. Mooted Issues

The mootness doctrine prevents courts from
rendering advisory opinions, which are outside the jurisdiction conferred by
article II, section 1 of the Texas Constitution.  See Valley Baptist Med. Ctr. v. Gonzalez,
33 S.W.3d 821, 822 (Tex. 2000).  An issue
may become moot when a party seeks a ruling on some matter that, when rendered,
would not have any practical legal effect on a then‑existing
controversy.  See In re H&R Block
Fin. Advisors, Inc., 262 S.W.3d 896, 900 (Tex. App.CHouston
[14th Dist.] 2008, orig. proceeding); City of Farmers Branch v. Ramos,
235 S.W.3d 462, 469 (Tex. App.CDallas
2007, no pet.).













Michael=s
arguments under Issue 1 were effectively mooted by our holding in M.R.J.M.
I.[4]  193 S.W.3d at 674B76.  And his arguments under Issue 4 and part of
Rehearing Issue 1 were also mooted by our order in M.R.J.M. I, as well
as by our September 9 order.[5]  See id. at 676.  Issue 2 and part of Issue 3 were also
mooted:  Issue 2 by our September 9
order, and Issue 3 by our holding in D.W.[6]  249 S.W.3d at 640.  We now address the following overlapping
issues: the remainder of Issue 3 and Rehearing Issues 2, 3, 4, and 5.

C. Trial Court=s
Comment

In Issue 3, Michael complains that Athe
trial court told the venirepersons that the case involved injured children that
the parent had allegedly abused.@  Because his daughter, M.R.J.M., had not been
injured and there were no allegations that Michael had harmed her or any other
child, he asserts that this comment was prejudicial and improper.

To preserve a complaint for appellate review, a
party must have presented to the trial court a timely request, objection, or
motion that states the specific grounds for the desired ruling, if they are not
apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a).  If a party fails to do this, error is not
preserved, and the complaint is forfeited. 
Bushell v. Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh=g).  The following conversation occurred during
voir dire:

[State=s attorney]: . . . But we=ve got four children,
ranges two to six, and we need every one of you that gets chosen to listen to
the evidence and decide does this parent=s rights need to be terminated.  And it=s not really about the parent, it=s about the
children.  It=s always about the
children.

 








[The Court]: I think that
we=ve only had a little
discussion about verbal abuse.  And I
think it=s important for the panel
to know that the facts that you will hear about this week are much more serious
than verbal abuse.

 

[State=s Attorney]: Your HonorC

 

[The Court]: And those of
you that are taking into account the difficulty, realize it=s not verbal.

 

Mother=s attorney then requested to
approach the bench and a conversation was held off the record.  Because Michael failed to object, he did not
preserve this issue.[7]  See Tex. R. App. P. 33.1(a); Bushell,
803 S.W.2d at 712.  We overrule this
portion of Issue 3.

D. Factual Sufficiency








In Issue 3 and Rehearing Issues 2, 3, and 4,
Michael complains that the evidence is factually insufficient to support the
jury=s
findings on endangerment and constructive abandonment and its best interest
finding.  See Tex. Fam. Code
Ann. ' 161.001(1)(D), (E), (N),
(2). 

1. Standard of Review

A parent=s rights
to his children are constitutional interests. 
See In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  But while parental rights are of
constitutional magnitude, they are not absolute.  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002). AJust as
it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.@  Id.  In a termination case, the State seeks not
just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination decisions must be supported by clear
and convincing evidence.  Tex. Fam. Code
Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ 
Id. ' 101.007 (Vernon
2002).  In reviewing the evidence for
factual sufficiency, we must give due deference to the factfinder=s
findings and not supplant the verdict with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the parent violated subsections (D), (E), or (N) of section
161.001(1) and that the termination of the parent-child relationship would be
in the best interest of the child.  C.H.,
89 S.W.3d at 28.  If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

2. Endangerment








Endangerment is defined as exposing to loss or
injury, to jeopardize.  In re J.T.G.,
121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.).  Under subsection
(D), it is necessary to examine evidence related to the environment of the
child to determine if the environment was the source of endangerment to the
child=s
physical or emotional well‑being.  In
re D.T., 34 S.W.3d 625, 632 (Tex. App.CFort
Worth 2000, pet. denied).  A child is
endangered when the environment creates a potential for danger that the parent
is aware of but disregards.  See In re
S.M.L., 171 S.W.3d 472, 477 (Tex. App.CHouston
[14th Dist.] 2005, no pet.). 
Inappropriate, abusive, or unlawful conduct by persons who live in the
child=s home
or with whom the child is compelled to associate on a regular basis in his home
is a part of the Aconditions or surroundings@ of the
child=s home
under section 161.001(1)(D).  Castorena
v. Tex. Dep=t of Protective & Regulatory
Servs., No. 03‑02‑00653‑CV, 2004 WL 903906, at *8 (Tex.
App.CAustin
Apr. 29, 2004, no pet.) (mem. op.); see also In re W.S., 899 S.W.2d 772,
776 (Tex. App.CFort Worth 1995, no writ)
(stating that Aenvironment@ refers
not only to the acceptability of living conditions, but also to a parent=s
conduct in the home).

Under subsection (E), the relevant inquiry is
whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act.  J.T.G., 121 S.W.3d at 125.  Termination under subsection (E) must be
based on more than a single act or omission; a voluntary, deliberate, and
conscious course of conduct by the parent is required.  Id.; D.T., 34 S.W.3d at 634.








To determine whether termination is necessary,
courts may look to parental conduct occurring both before and after the child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).  The factfinder may infer from past conduct
endangering the child=s well‑being that similar
conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 267 n.39, and C.H., 89
S.W.3d at 26.  Drug abuse during
pregnancy constitutes conduct that endangers a child=s
physical and emotional well‑being. 
See In re W.A.B., 979 S.W.2d 804, 806B07 (Tex.
App.CHouston
[14th Dist.] 1998, pet. denied) (upholding termination where mother used
illegal drugs during and after pregnancy), disapproved of on other grounds,
J.F.C., 96 S.W.3d at 267 n.39; Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).  Conduct that subjects a
child to a life of uncertainty and instability also endangers the child=s
physical and emotional well‑being. 
See In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan
Antonio 1998, pet. denied) (using illegal drugs and violating parole provided
sufficient evidence of endangerment). 
While imprisonment alone is not a basis to terminate a parent=s rights,
it is an appropriate factor to consider because when a parent is incarcerated,
he or she is absent from the child=s daily
life and unable to provide support to the child, negatively impacting the child=s living
environment and emotional well-being.  See
S.M.L., 171 S.W.3d at 478B79.  To support a finding of endangerment, the
parent=s
conduct does not necessarily have to be directed at the child, nor is the child
required to suffer injury.  Boyd,
727 S.W.2d at 533.

Because the evidence pertaining to subsections
161.001(1)(D) and (E) is interrelated, we may conduct a consolidated
review.  M.C.T., 250 S.W.3d at
169; see also In re M.R., 243 S.W.3d 807, 819 (Tex. App.CFort
Worth 2007, no pet.) (holding that there was legally and factually sufficient
evidence of both endangerment grounds when, among other things, the evidence
showed that parent exposed children to domestic violence and refused to
participate in CPS service plan).








With regard to subsections (D) and (E), Michael
complains that while there was evidence that he knew Mother used marijuana and
other drugs at one time, there was also evidence that he was unaware that she
was still using marijuana, that he had no knowledge that Mother had resumed
using the other drugs, and that he was not aware that Mother was physically or
emotionally abusing any of the children.

Michael also acknowledged, however, that Mother
was a drug addict when he met her, and he testified that he used drugs after
M.R.J.M. was born.  Mother testified that
she smoked marijuana while pregnant with M.R.J.M. and that Michael was present
when she did.  Mother testified that she
had never done anything after breaking up with Michael to give him the
impression that she was no longer using drugs. 
Michael testified that after Mother had more children, AI
believe that if she was using drugs, the doctors would have tested her and the
kids [would] have been removed.  They
were not.@

Mother testified that Michael hit her only once,
but that she was holding M.R.J.M. at the time. 
Michael admitted that he hit Mother, but he claimed that it was in
self-defense and that Mother was not holding M.R.J.M. at the time.








Mother testified that she always initiated visits
between M.R.J.M. and Michael, even though Michael knew where to find them, and
that she took M.R.J.M. to visit him three or four times after they separated
but that Michael never sought M.R.J.M. out and he never brought formula or
diapers.  Michael agreed that he always
knew where Mother lived.  He claimed that
he called M.R.J.M., spoke with her Aalmost
all the time,@ and initiated phone contact 99%
of the time and that he walked tremendous distances to visit M.R.J.M., bring
her food, and make sure that she was safe. 
But he also testified that he never went to Mother=s house
to check on M.R.J.M.

Mother testified that Michael once told her that
he would rather let his family starve than to get out and do anything.[8]  Mother testified that Michael=s sister
called CPS in 1999 because she was concerned about M.R.J.M. not being fed.  Michael=s sister
testified that she saw Mother and Michael feed M.R.J.M. water instead of milk
or formula when M.R.J.M. was an infant, that the baby did not have any food,
and that their house was dirty during that visit.

Mother testified that Michael=s
priorities are Aall about him and his injuries.@  Michael receives government disability
payments for his back injuries.  Mother
testified as follows with regard to Michael=s
behavior when M.R.J.M. was born:








Q.     What
did [Michael] tell you he felt about the day you were in the hospital?

 

A.     Well,
prior to [M.R.J.M.] being born there was always hospital visits.  And the day she was born he=d actually made a
statement that he couldn=t believe I was being
admitted into the hospital when he wasn=t over his back injuries.  And [M.R.J.M.] was laying on the bed and the
nurse was in there, and he actually grabbed his chest.  He kind of went over, but he didn=t fall on her, and we
moved her.  Then he stayed in the
hospital bed the entire time, until he went home later that night.

 

Q.     In
your hospital bed?

 

A.     Yes,
ma=am.

 

Q.     Where
were you?

 

A.     On
the chair with the baby and my family.

 

Michael=s
contributions to M.R.J.M.=s financial welfare, other than
$200 that he sent to her over a period of four years from her birth, began with
a deduction from his government disability payments when she was around four
years old.  Mother testified that she had
to pawn her stereo the day that M.R.J.M. was born in order to pay the electric
bill, and that when she was with Michael, they frequently went without
electricity or food.  Both Michael and
Mother testified about his pack-a-day cigarette habit, and Michael testified
that he lost forty pounds in a year because he did not have sufficient money to
buy food.








Mother testified that she did not think that
Michael could take care of M.R.J.M., stating, 

He was old enough then to take care of us, to
take care of her, and he didn=t.  And I don=t think
that can change now.  I don=t think
she=d be
safe there; mentally, emotionally.  I don=t think
he is responsible enough to take care of her. . . . I don=t know
if the heat=s going to be on.  I don=t know
if the electricity is going to be on every time.

Additionally, at the time of trial, Michael was on felony probation
for a 2001 forgery conviction, and he testified that he had known for over a
year that there was a warrant out for him because he had not reported in on
that probation since 2002Calmost three years before trial.[9]  He testified that if he had had M.R.J.M. with
him and had been arrested, he did not believe that this would have risked her
safety and security.








Based on the foregoing and giving due deference
to the jury=s findings, the jury could have
formed a firm belief or conviction that Michael knowingly allowed M.R.J.M. to
remain in an endangering environment with Mother by ignoring Mother=s drug
use and failing to check on M.R.J.M. and that he engaged in endangering conduct
by neglecting M.R.J.M. and his probation responsibilities and by knowingly
placing M.R.J.M. with Mother, a person who engaged in endangering conduct.[10]  See Tex. Fam. Code Ann. ' 161.001(1)(D),
(E); H.R.M., 209 S.W.3d at 108. 
Therefore, we overrule this portion of Issue 3 and Rehearing Issues 2
and 3.

3. Constructive Abandonment

A parent constructively abandons a child when (1)
the child has been in the permanent or temporary managing conservatorship of
the State or an authorized agency for not less than six months, (2) the State
or the authorized agency has made reasonable efforts to return the child to the
parent, (3) the parent has not regularly visited or maintained significant
contact with the child, and (4) the parent has demonstrated an inability to
provide the child with a safe environment. 
Tex. Fam. Code Ann. ' 161.001(1)(N);
In re A.S., 261 S.W.3d 76, 88B89 (Tex.
App.CHouston
[14th Dist.] 2008, pet. denied).  Michael
contests the second, third, and fourth elements of the constructive abandonment
ground.








The State=s
preparation and administration of a service plan for the parent constitutes
evidence that the State made reasonable efforts to return the child to the
parent.  See, e.g., In re K.M.B.,
91 S.W.3d 18, 25 (Tex. App.CFort
Worth 2002, no pet.); In re S.S., No. 11-05-00083-CV, 2006 WL 1285125,
at *2B3 (Tex.
App.CEastland
May 11, 2006, no pet.) (mem. op.). 
Michael=s attorney stipulated that five
service plans were prepared for Michael. 
Furthermore, although Michael lived in Mabank, Texas, the State made
special arrangements for Michael to have parenting classes nearby, in Athens,
Texas.[11]  And a CPS worker came out to Michael=s home
and drove him to his psychological assessment. 
Nonetheless, Michael failed to complete his service plan: he failed to
attend his drug, alcohol, and MHMR assessments, and he neglected to complete
the parenting classes.

Michael had only two visits with M.R.J.M. over a
seventeen-and-a-half month period, complaining that he lacked money and
transportation to visit more frequently. 
His second visit occurred eight days before trial.  With regard to his transportation problems,
Michael testified that it cost him $112 to visit M.R.J.M. and that he could not
afford that on the amount of money he receives for his disability.  However, he also testified that he pays $67
per month for cable and approximately $14 per week ($56 per month) to support
his cigarette habit.  And the jury heard
the following testimony from Michael at trial:








Q.     The
question was, [M.R.J.M.] has a right to expect that someone who wants to parent
her comes and visits with her and makes a bond with her every month, at
least.  You haven=t done that, have you?

 

. . . .

 

A.     No.

 

Q.     So
you haven=t had consistent contact
with her?

 

A.     No.

 

Q.     You
haven=t maintained a
significant contact with her, have you?

 

A.     No.

 

Q.     And
you haven=t visited regularly?

 

A.     No.

 

Michael did write to M.R.J.M., but one of his three letters that was
entered into evidence was deemed inappropriate by CPS and not delivered.[12]








Michael testified that he and his brother lived
together and that someone from CPS had visited his trailer four or five months
before trial, before he started to restore the twenty-year-old trailer.  He testified, AI risked
my life to restore my home,@
referring to his physical disabilities, and he testified that he invested all
of his money in his trailer.

Although Michael testified that he spent $3,000
to restore the interior of his trailer and to fix a room for M.R.J.M., he
admitted that all of the electrical sockets and plugs were not completely
installed and that those might constitute a hazard, he admitted that he was not
finished with the restoration yetCincluding
M.R.J.M.=s
bedroom and bathroom, and he stated that to finish the restoration would take
an additional two weeks.

Based on the foregoing and giving due deference
to the jury=s findings, the jury could have
formed a firm belief or conviction that Michael constructively abandoned
M.R.J.M. by failing to regularly visit or maintain significant contact with
her, by demonstrating an inability to provide her with a safe environment, and
by failing to complete his service plan despite the State=s
reasonable efforts to return M.R.J.M. to him. 
See Tex. Fam. Code Ann. ' 161.001(1)(N);
H.R.M., 209 S.W.3d at 108.  Therefore,
we overrule this portion of Issue 3 and Rehearing Issue 4.

4. Best Interest of
the Child








There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  The following
factors, among others, should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:  the child=s age
and physical and mental vulnerabilities; the willingness and ability of the
child=s family
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency=s close
supervision; the willingness and ability of the child=s family
to effect positive environmental and personal changes within a reasonable
period of time; and whether the child=s family
demonstrates adequate parenting skills, including providing the child with
minimally adequate health and nutritional care, a safe physical home
environment, and an understanding of the child=s needs
and capabilities.  Id. ' 263.307(b);
R.R., 209 S.W.3d at 116.








Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include:  the desires of the child;
the emotional and physical needs of the child now and in the future; the
emotional and physical danger to the child now and in the future; the parental
abilities of the individuals seeking custody; the programs available to assist
these individuals to promote the best interest of the child; the plans for the
child by these individuals or by the agency seeking custody; the stability of
the home or proposed placement; the acts or omissions of the parent which may
indicate that the existing parent‑child relationship is not a proper one;
and any excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  These factors are not exhaustive;
some listed factors may be inapplicable to some cases; other factors not on the
list may also be considered when appropriate. 
C.H., 89 S.W.3d at 27. 
Furthermore, undisputed evidence of just one factor may be sufficient in
a particular case to support a finding that termination is in the best interest
of the child.  Id.  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.  Id.








M.R.J.M. receives counseling twice a month from a
licensed counselor, Heather Brogan McCarty, who specializes in abused or
neglected children, and she had been attending counseling for over a year by
trial.[13]  One of Michael=s two
visits with M.R.J.M. occurred with McCarty there.  McCarty testified that Michael told her his
goal for that visit was to see if M.R.J.M. wanted to live with him and that he
had brought M.R.J.M. some presents.  She
testified that she informed Michael that Ait was
not okay for him to give [M.R.J.M.] the presents prior to asking her where she
wanted to live so that it didn=t seem
like a bribe.@ 
However, Michael still gave M.R.J.M. the presents prior to talking with
her about where she wanted to live.[14]  McCarty also testified that Michael made a
lot of promises to M.R.J.M. that she thought were unlikely to occur.[15]  She testified that at the end of the session,
M.R.J.M. told Michael that she wanted to stay where she was.








McCarty also testified that M.R.J.M.=s foster
parents had no unrealistic expectations about M.R.J.M. and her siblings, that
they had good parenting skills, and that she had no concerns at all about
M.R.J.M. or her siblings being in the foster home.  McCarty testified that her concerns about
Michael were that he would not be able to meet M.R.J.M.=s needs
or follow through with the promises that he had made to M.R.J.M., including her
visits with her siblings.[16]  Michael admitted at trial that he had not
looked into whether dance classes for M.R.J.M. were available in his area.

With regard to M.R.J.M.=s
siblings, Michael testified that he never thought about what it might do to
M.R.J.M. to take her from the foster home and away from her brothers and sisters.  He stated,

The decision in reference
to splitting the children up, I am adamant in stating that this is not a
concern of mine in reference to the way I should view it.  Because I know that I can allow [M.R.J.M.] to
visit the other children.  And that=s my contention is that
being [M.R.J.M.=s] dad, ICI shouldn=t have to be denied my
right to be a dad because there=s other children involved.

 

Michael=s sister testified that before
trial, Michael called her and said, AI
understand [that] you=re going to be sittingCyou=re going
to be on the side of the children.@  She testified that she tried to explain to
him why she felt it was in M.R.J.M.=s best
interest to stay with her siblings.








Furthermore, Mother, Michael=s
sister, and Michael himself testified about Michael=s
conspiracy theories.  Mother testified
that Michael was paranoid and saw conspiracies everywhere, and that A[w]hen
you expressed to him that you didn=t
understand [his thoughts on conspiracy], that they w[ere] off the wall, then
you must be in on it too.@ 
Michael testified that he felt that the reason the State had custody of
M.R.J.M. was that he was being extorted and that it was Aoppression
through the State of Texas for custody of my daughter,@ and he
would not go to the State for assistance because it would not provide him with
assistance.[17]  He also testified about a girl who lived in
Mabank that was the same age as M.R.J.M., that he believed that the girl was
M.R.J.M.=s twin,
and that he wanted a paternity test to prove it.  He gave the following testimony with regard
to a July 2004 letter that he sent his CPS caseworker:

Q.     Let=s look down at the bottom,
towards the bottom of the page, about three quarters of the way.  A[Mother] is not an honest individual and although
I=m the parent of a child,@ quote, A>[M.R.J.M.]?= I have no regrets as the
letterCas a letter she wrote to
me, which is included. [B]elieve her dad is Ricky, a neighbor of mine.  May be wrong. 
If you ever have a chance to watch the movie, >Lamboda,= Lou Diamond Phillips,
the scene at the end of the movie with a plane wreck was in reference to
me.  Both Thomas and Ricky, I believe, to
be doctors.@  Why is that important?

 

A.     Because
I=m going through a case
pertaining to [M.R.J.M.], and this isn=t a runaway jury type of case.  This pertains to my daughter.  This doesn=t pertain to tobacco issues or the lung issues
that I might have going on in my health.

 

Q.     Okay.

 

A.     I
know that she [apparently, Mother] does associate herself with a tobacco
company.








Q.     Let=s look at the next page
at the bottom, it=s the last sentence, AI never married [Mother],
nor am I dead.  Yet the Cowboys receive
400 million for a stadium referred to . . . Enron article.  I=ve been referred to as many people from .
. . Lenny, John, Ron plus more.@ [W]hy was the Cowboys stadium important in the
cost?

 

A.     Because
the money in reference to that case right there, for which I have mentioned to
my attorney, I believe to be my money.

 

Q.     ADepends on the
[S]tate.  This isn=t Night of the Living
Dead to Kelly=s version or Carey in
Oklahoma.@  [W]hat did that reference?

 

A.     I=m living, okay.  I mean, I live a simple life.  Old Johnny in Arlington isn=t dead.  I meanCI mean, you got to understand, people have
another identity sometimes or an alias for which you may not always know.

 

. . . .

 

Q.     . . .
I want to look at what kind of looks like the third paragraph, it=s a little bit above the
middle of the page.  AEither way, although I am
concerned for the children, I=m leaving the investigation to the,@ quote, A>fraudulent.=  Believe they refer to me and the injuries I
have.  Remember Lisa is Bart=s sister.@  Was that another attempt at humor?

 

A.     Actually,
Lisa Kudrow is a real good friend of mine. 
I will clarify this right now.  I
do know a Lisa Kudrow, for which she stars on AFriends.@  I dated her in high school.  So, yeah, I refer to her a lot.

 

Q.     . . .
[I]n this letter when it says, Aremember Lisa is Bart=s sister,@ you=re talking about Lisa
Kudrow?

 

A.     Yes.  I want to clarify this right now.

 








Q.     AYou have a chance to
review an article by a Lisa Steadfelt the Third.  Christopher is Bart and I have included a
press clipping in reference to Barbara and Chris.  This infringes on conspiracy and a possible
attempt on my life.  Also I have given
possible leads to theft involving Doug.@  So you
believe there were threats on your life?

 

A.     I
believe in the past I=ve had threats upon my
life, yes.  But I=m not saying at this
point in time myCmyCmy situation right now is
dangerous for [M.R.J.M.], because it=s not.  I=ve survived in my
community just fine for three years.

 

With regard to a January 2005 letter to his CPS worker, Michael
elaborated as follows:

Q.     Look
on the second page at the bottom, last paragraph.  ALove [M.R.J.M.], glad you had the chance to
participate in this.  This could be a
tobacco lawsuit.  Might have to talk to
Gene Hackman.@  What did that mean?  What=s the tobacco lawsuit?

 

A.     Well,
I believe at this point in time I have lung problems that are being covered up
medically.  And I think they=re beingClying about my medical
condition because in Arkansas, I traveled to Arkansas.  And I sought medical, and they found a blotch
on my left lung.  Since returning to
Texas, I have not been able to obtain a doctor for which will view that film
and say you have anything wrong with your lung. 
But Arkansas contests that there is.

 

Q.     Who
was Gene Hackman?

 

. . . .

 

A.     It
would appear as though he=s a lawyer.

 

. . . .

 








Q.     The
next paragraph says, AAt this point as America
views the situation we learn about government, civil rights and especially
parent rights.  I suggest parents, moms
especially, should have kids at home and not at a hospital.  Kids for some reason tend to disappear.@  Where do they go?

 

A.     One
more time, I=m questioning the medical
pertaining to my daughter.  I mean, I
guess the twins may just be factual.  As
stated before, there=s a beautiful little girl
in my community that is her precise age. 
Now, until I can be proven that this woman=s DNACI=m sorry, this girl=s DNA is not my daughter,
I will contest that she is my daughter up until proven otherwise by this court.

 

. . . .

 

The Court: So you=re requesting this Court to order a little girl
that lives in Golden Acres to be DNA tested?

 

A.     Yes, ma=am.

Michael testified as follows with regard to his
letter dated September 14:

Q.     So I=m about three quarters of
the way down.  And it says, AQuestioned the Child
Protective Services in Weatherford. 
Review the medical findings of the case manager investigator for which
is in question have a past history pertaining to illegal activity, where
involved in my neighbor=s case.  This isn=t a tobacco lawsuit, or is it?@  Do you think our case is a tobacco lawsuit
too?

 

A.     Yeah,
I thinkCI think I need to know
who John Grisham is, to be honest.  I
have no idea.  Has this CourtChas this been in
reference to any other material at all other than my daughter?  Yes, I am very concerned of issues pertaining
to this.  And if there is any evidence
for which we=ll find that you
pertained in any other legal proceedings involving me, then I would ask the
Court to respect my civil rights.

 








Q.     Let=s continue.  AIf this is, I haven=t been paid.  Not smart, yet I have common sense to know
when I should protect my rights.  As
stated before, Thomas, Rick and Phillips have a history, and Steve Martin just
might be Lee Harvey Oswald.  Steve,
Delores and MaryCSteve, Delores and Mary
have a history of involving themselves in children=s lives.  Abusing the system, >Rosemary=s Baby,= to Steve Martin
mov[ie] . . . involving the child he found in the woods near a
lake.  >Bless the Child= family on the opposite
side of the street from me.  The judge in
>Identity= was the judge in a
recent movie Steve Martin produced.  As
stated before this case stems back to 2001.@  And we=re going to skip that
next part.  If you would go towards the
end, and I think you=re asking the Judge, Aif you assist me in
obtaining this I won=t sing the Lamboda while
I=m here in court.@

 

A.     Yeah.  Ricky, I guess Richard Pryor, Ricky and I,
Ricky, whatever his name is, Vallens or whatever, he does live on the right
side of me.  So, yeah, I guess I question
Dolores Phillips [his CPS worker] having known this individual, yes.

 

Michael=s letters were admitted into
evidence.

Michael also testified that he expected M.R.J.M.
to respect him, to believe him, and to be reared according to his beliefs.  He stated, Auntil
you can prove me wrong, anything I=ve
stated in this court of law today, I believe to be right.@ 

Mother testified that, even if Michael had completed
his service plan, she would still have doubts about his ability to care and
provide for M.R.J.M., stating that she would Aworry
about her living in a car one day.  Going
without food or groceries.@








The evidence at trial demonstrated that Michael
lacked the will and ability to provide M.R.J.M., then age six, with a safe
environment:  he failed to accept,
complete, and cooperate with the State=s
service plan; he failed to effect personal and environmental changes until only
a short time before trialCthe last two months in a
seventeen-month process; and he failed to demonstrate adequate parenting
skills.  Furthermore, the jury heard his
bizarre testimony about his conspiracy theories, including his theory that
M.R.J.M. had a twin that lived across the street from him.

The jury could have chosen to believe M.R.J.M.=s
therapist=s testimony that M.R.J.M. wanted
to stay with her foster family and with her siblings and Mother=s
testimony that the foster family provided M.R.J.M. and the other children with
the structure that neither she nor Michael ever provided.  Because the jury could have formed a firm
belief or conviction that terminating Michael=s
parental rights to M.R.J.M. was in M.R.J.M.=s best
interest, we conclude that the evidence is factually sufficient.  See H.R.M., 209 S.W.3d at 108; C.H.,
89 S.W.3d at 28.  We overrule this
portion of Issue 3.

E. Broad Form Jury Charge








Finally, Michael asserts in Issue 3 and Rehearing
Issues 1 and 5 that he challenged the trial court=s broad
form submission of the jury charge. 
However, he admitted that this challenge is contradicted by controlling
Texas case law that specifically authorizes broad form submission in parental
rights cases.  See Tex. Dep=t of
Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh=g); see
also J.T.G., 121 S.W.3d at 128B29
(applying E.B. to uphold jury findings on grounds for termination when
multiple grounds for termination were sought and the trial court submitted the
issue using a broad form question). 
Furthermore, having found no error with regard to his factual
sufficiency challenges, it is unnecessary for us to consider whether
disjunctive submission was harmful.  See,
e.g., In re J.M.M., 80 S.W.3d 232, 245, 248B50 (Tex.
App.CFort
Worth 2002, pet. denied) (reaching same conclusion on similar facts), disapproved
of on other grounds, J.F.C., 96 S.W.3d at 267 n.39.  Therefore, this issue is moot.  We overrule this last portion of Issue 3 and
Rehearing Issue 5.

                                          IV.
Conclusion

Having overruled all of Michael=s
issues, we affirm the trial court=s
judgment terminating Michael=s
parental rights to M.R.J.M.

 

BOB
MCCOY

JUSTICE

 

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

 

DELIVERED: February 26,
2009











[1]Mother pleaded guilty to
two felony counts of injury to a child after hospital authorities discovered
that her eight-month-old twins had skull fractures, black eyes, and other
serious injuries.  Her other two
children, including M.R.J.M., suffered from serious cases of head lice.  Mother blamed her then-boyfriend for abusing
her children and testified that she never saw anything.





[2]Michael=s statement of points
contains the following:  that the evidence
was factually insufficient to support the jury=s findings on the grounds
for termination under section 161.001(1)(D), (E), (N), and (2); that the trial
court misinformed the venire and commented on the weight of the evidence during
voir dire; that the trial court erroneously submitted the charge in broad form;
that section 263.405(i) violates the Separation of Powers Doctrine; and that,
to the extent section 263.405 requires a showing that an appeal would not be frivolous
before the appeal may proceed, it violates the Due Process Clause of the United
States Constitution.





[3]Michael argued on
rehearing that his appeal could not be frivolous because, during the pendency
of his appeal, this court decided that section 263.405(i) was void as violating
separation of powers.  See In re D.W.,
249 S.W.3d 625, 640 (Tex. App.CFort Worth) (holding that section 263.405(i) is
unconstitutional because it unduly interferes with the appellate court=s substantive power to
rehear and determine issues on the merits that were decided in the court
below), pet. denied, 260 S.W.3d 462 (Tex. 2008).  And he argued that his appeal could not be
frivolous because this court granted an en banc hearing in M.R.J.M. I.  The State conceded on rehearing that these
points were not frivolous.





[4]Michael argued that our
review was curtailed because section 263.405(g) limited the contents of the
appellate record to the frivolousness hearing record only, and he argued that
our opportunity to review was limited by a lack of briefing on the merits.  However, we determined in M.R.J.M. I
that an appellate court has the authority to order the preparation of a record
of all the evidence in a termination case when necessary to review a trial
court=s determination that an
appeal raising a factual sufficiency complaint is frivolous.  193 S.W.3d at 674B76.  And section 263.405(g) provides that the
court, in considering an appeal of the trial court=s frivolousness finding,
may require the parties to file appellate briefs on the issues presented, as we
did here.  See Tex. Fam. Code Ann.
' 263.405(g); M.R.J.M.
I, 193 S.W.3d at 674B76.





[5]Our September 9 order
acknowledged that Michael=s issue challenging the
constitutionality of section 263.405(i) was not frivolous and effectively
mooted Michael=s complaint about section
13.003(b) of the civil practice and remedies code being used as the trial court=s standard for
determining whether his appeal was frivolous. 
See Tex. Fam. Code Ann. ' 263.405(d)(3); Tex. Civ. Prac. & Rem.
Code Ann. ' 13.003(b) (Vernon 2002).





[6]In Issue 2, Michael
argued that section 263.405=s required showing that an appeal is not
frivolous violates procedural due process because it emphasizes the speed of
judicial proceedings over accuracy and the best interest of the child by
unfairly requiring appellate counsel to identify appellate issues and argue the
merits of those issues without the benefit of a record.  See Tex. Fam. Code Ann. ' 263.405(f)
(appellate record not due until sixty days after order); id. ' 263.405(b)
(statement of points due within fifteen days after order); id. ' 263.405(i)
(appellate court cannot consider any issues not presented in the statement of
points).  In Issue 3, he complained that
section 263.405(i), the statement of points requirement, violated the
Separation of Powers Doctrine.  However,
while a parent=s right to retain custody
of his children is a constitutionally protected liberty interest that must be
afforded procedural due process, see In re G.C., 66 S.W.3d 517, 524B25 (Tex. App.CFort Worth 2002, no
pet.), Michael was not harmed here by the statutory deadlines because we have
since held that the trial court abused its discretion by finding his appeal
frivolous, ordered the entire trial record to be produced for him, and held
that an appellant is not limited to raising on appeal only those issues
contained in the statement of points.  See
D.W., 249 S.W.3d at 640; see also M.R.J.M. I, 193 S.W.3d at 674B76 (holding that
appellate court can order the preparation of a reporter=s record of the
termination trial).





[7]Furthermore, a trial
court has great discretion in the manner it conducts a trial, and it possesses Athe authority to express
itself in exercising this broad discretion.@  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 240B41 (Tex. 2001). 
And the complaining party first must show that the comments were
improper and then show that the improper comments prejudiced him.  Metzger v. Sebek, 892 S.W.2d 20, 39
(Tex. App.CHouston [1st Dist.] 1994,
writ denied), cert. denied, 516 U.S. 868 (1995).  Michael is unable to do that on the record
before us.  The trial court=s comment was not
inaccurate as this case involved termination of parental rights to four childrenCM.R.J.M. and her three
younger half-siblings.  Two of those
half-siblings had been injured, and Mother had pleaded guilty to charges of
felony injury to a child; at this point in the trial, she had not yet signed an
affidavit of relinquishment of her parental rights.  Our review of the record reveals no testimony
by any witness that Michael had physically abused M.R.J.M., and the jury was
instructed to consider only the exhibits and evidence introduced under oath.





[8]Michael=s sister testified that
although Michael has back problems, he is still capable of working.  Michael testified, ASocial Security does not
tell me I have to work. . . . Medicare would much rather my health be placed as
a priority than be placed in a position for where I have to work.@





[9]Outside the jury=s presence, the trial
court confirmed the open warrant, and Michael was arrested.





[10]For example, Mother
testified that M.R.J.M. had seen her smoke crack more than once.





[11]The trial court took
judicial notice of the fact that mileage between Athens and Mabank is 18.5
miles.  It took judicial notice of the
fact that mileage between Forney, where Michael was supposed to attend his MHMR
assessment, and Mabank is 36.3 miles, and not the 110 miles that Michael
complained of.





[12]In a letter dated
November 3, 2004, Michael=s CPS worker stated,

 

I cannot give [M.R.J.M.] this letter because it would not make much
sense to [her].  The letter talks about
things that you are questioning the state about and not focusing on
[M.R.J.M.].  [M.R.J.M.] needs a letter
that encourages her and talks about how you are doing.  You have in the past written very appropriate
letters and I am asking you to reflect on this and rewrite a letter to
[M.R.J.M.].





[13]McCarty testified that
when M.R.J.M. first came to see her, M.R.J.M. was having problems with
sleepwalking and nightmares.





[14]McCarty testified that
one of the presents, a portable CD player and two CD cases, one of which did
not contain a CD, was not an age-appropriate gift for M.R.J.M.





[15]McCarty testified that
Michael promised M.R.J.M. that if she came to live with him, she would maintain
contact with her siblings and that he would enroll her not only in dance
classes like her foster parents had, but that he Awould enroll her . . . in
every dance class she wanted to take if she came to live with him.@  McCarty testified that she found that
unlikely, based on Michael=s financial and transportation issues.





[16]McCarty testified, AI think that [to separate
M.R.J.M. from her siblings] would be very detrimental to her emotional
well-being and her feeling of safety and security.@





[17]Michael stated, AYou want to judge me as
an individual that=s trash for which the
State of Texas is supposed to protect.  I=m disabled.  Crimes against the disabled, I should be
protected of.  I wouldn=t go to you, ma=am, nor that Child
Protective Services over there for any assistance because I kn[e]w you wouldn=t help me.@